By the Court,
Cowen, J.
The bill of exchange was payable generally, mentioning no place. The drawees Were Stephen Sicard & Co., who accepted the bill as' a firm, thus becoming joint debtors. On the death of Sicard, he was discharged • at law, the liability devolving on the surviving partner, (Story on Partn. § 361, 362,) to whom alone the plaintiffs were bound to have the bill presented for payment. The mode, therefore, in which the bill was presented to the widow and supposed personal representative of Sicard, or whether she were in fact his representative, becomes entirely unimportant.
No objection was made at the trial that the presentment, which was at No. 4 Wall street, where the survivor transacted business, should have been at his residence or any other place. Therefore the question on the place of presentment does not arise. It must be taken to have been *638 proper. Nor was the manner of presentment denied to be proper; nor the day.
But it is objected that the time of day should have been mentioned in the notary’s certificate; for perhaps it might have been after the hours of rest. The certificate states that it was presented on the third day of grace. This, coming from a witness on the stand, would be deemed prima facie evidence of presentment at a proper time in the day; and if an improper hour were in truth selected, it would lie with the adverse party to show the fact by cross-examination or otherwise. It would not be intended that a late hour was resorted to. We think, therefore, that the certificate, in fair construction, imports a presentment during the proper hours of business. These, except where the paper is due from a bank, generally range through the whole day down to bed time in the evening. (Chitty on Bills, 421, (r.,) Am. ed. 1839, and cases there cited.) It would be quite a forced presumption on the words of an officer saying he presented on such a day, to fix the hour either before or after that when business is usually transacted. It would be to suppose the notary, at the expense of his own convenience, going at an improper hour for the mere sake of doing wrong.
It is no objection that the certificate of notice was drawn up by the notary two years, or any other length of time after notice was given. The statute gives it as a substitute for his personal testimony at the trial. It is properly called for and may be drawn up when it happens to be wanted as evidence. The notary cannot be expected always to prepare it as a matter of course; for non constat it may ever be wanted. It was said on the argument, that ordinarily it is drawn up and transmitted to the holder at or about the time when the business is done." That is the better practice; but it is not essential.
This brings us to the question of usury. It is not disputed that the case is one of loan on a bill made for the purpose of being discounted by the Cayuga Bank. That bank is a country institution, keeping funds in the city of *639 New-York, by means of which its drafts are receivable there "at par, or were so when the discount took place. Its own bills were one per cent, below par at New-York; and the borrowers, instead of taking these, took two drafts—one from the cashier who, being in New-York, arranged the loan • there, and the other directly from the bank. After deducting the usual rate of discount, the one per cent., being the true difference of exchange against Auburn, was also deducted ; and the two drafts drawn on New-York for the balance. This was insisted on • at the trial as usurious. The judge held it was not, and directed a verdict for the ■plaintiffs.
The application by the borrowers was, in short, this: “ I want the loan of your bills to $4912,50, [$5000, less the discount,] or what is equal to that in your city funds, which will be $49,12 less.” The latter is furnished. Such a transaction is not usurious, unless it would have been equally so for the baffle to loan its own bills at par.
It is said, the borrowers’ bill was payable at large, and the bank might have enforced its payment at New-York in city funds or specie. That is true, if the bank had not continued the holders. Remaining with the bank, however, the bill was payable at Auburn. But the question of usury does not I apprehend depend, in cases of this kind, upon accidental circumstances. It goes upon the right of' the bank primarily to lend its own bills and receive a note for their nominal amount, making the ordinary discount. So far the transaction is strictly a loan ; and there it would ordinarily stop. But the bank happens to have funds in New-York which are slightly more valuable—in this case, one per cent—funds which it has made thus valuable at an expense equal to the difference of exchange. The borrowers prefer, or are willing to take by way of purchase and as a substitute for the direct loan, an amount of those New-York funds equal to the bills of the bank. It is entirely clear that the bank makes nothing by thus changing the form of the transaction. . It deals on its legiti *640 mate discount only; and there is no question in such case to be determined by the jury. It is, in one branch, a contract of remittance. The specie represented by the bank bills which are loaned, is in the, country, and its immediate transportation to New-York is desirable. The bank by its drafts enables the borrowers to command it at New-York, without the expense of actual transportation.
Thus the transaction involves, when we come to analyze it, two distinct bargains. It is in effect, first, a loan by the agent and a delivery to the borrowers of bills upon the agent’s own bank, corresponding in nominal amount with that of the proposed loan. Upon this, secondly, the borrowers buy the draft of the bank upon funds more contiguous to themselves, of a less nominal amount, but really equal in value to the bank bills which they have obtained. This would indeed be usurious, if the bank made a profit by the transaction beyond the lawful discount. But we know that, in general, country banks dealing in this way. do not. In the thing, per se, we can discern no profit any more than in a like sale of exchange on funds in London at the usual rate. In a transaction so common, therefore, the origin and effect of which among bankers is so well understood, something more than the naked fact seems clearly necessary to raise a question. One instance readily occurs to the mind—pressing the borrower to make an allowance beyond the general difference of exchange between the two places -in respect to which the parties are dealing. So, giving drafts which have a long time to run. Nothing of either kind, however, or any thing else out of the ordinary line, was shown at the trial.
There are several cases going, 1 think, to sustain the views I have suggested, among which are the following: Hammett v. Yea, (1 Bos. & Pull. 144;) Merritt v. Benton, (10 Wend. 116;) Walworth, Ch. in Williams v. Hance, (7 Paige, 583 ;) Jones, ex parte, (17 Ves. 332;) Spencer, J. in Dunham v. Dey, (13 John. R. 47.)
It is scarcely necessary to add, that this whole .transaction must be regarded as in effect taking place at the bank. *641 although the cashier happened to be at New-York. The bank officers, the means and machinery of the bank" were employed. The plaintiffs gained just as much and no more than if the business had in fact been done at Auburn, unless some account is to be made of the few days required for sending and returning the small draft issued by the teller. This delay may not be fully explained; but the -gain, if any, arising from it was not enough to warrant a presumption of its being intended for usury on discounting a bill of $5000.
New trial denied.